**ALCO STANDARD CORPORATION, an Ohio Corporation, Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, a U.S. Corporation, Defendant,**

v.

**WESTINGHOUSE ELECTRIC CORP., a Delaware Corp., Third-Party Defendant.**

No. 77–2513 H.

United States District Court,
W.D. Tennessee, W.D.

Oct. 22, 1984.

See also D.C., 516 F.Supp. 431.

Roy Keathley, Memphis, Tenn., Edward A. Haight, Rolf O. Stadheim, Gomer W. Walton, Chicago, Ill., for Alco Standard Corp.

Herbert S. Sanger, Jr., Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Don O. Whitehead, Nicholas A. Della Volpe, Tennessee Valley Authority, Knoxville, Tenn., for Tennessee Valley Authority.

Robert M. Johnson, Memphis, Tenn., John F. Lynch, Alan H. Gordon, Houston, Tex., for Westinghouse Elec. Corp.

## OPINION

HORTON, District Judge.

This is an action for patent infringement brought by plaintiff, Alco Standard Corporation, against defendant, Tennessee Valley Authority (TVA), and third-party defendant Westinghouse Electric Corporation. TVA hired Westinghouse to inspect turbine rotors in TVA's generating plants. In performing such inspections for TVA, Westinghouse allegedly used a device that infringed U.S. patent 3,960,006 (006 patent). The 006 patent was issued for an ultrasonic inspection device invented by Robert Smith, an employee of Commercial Machine Works (CMW), which is a division of the plaintiff Alco Standard Corporation. Alco Standard Corporation is the assignor of the patent in suit. Under the Tennessee Valley Authority Act of 1933, TVA is entitled to use patented technology provided the patent owner is paid "reasonable compensation." 16 U.S.C. § 831r. Westinghouse is indemnifying TVA for any infringement resulting from these inspec-

tions, and although named as third-party defendant, Westinghouse has actively conducted the defense to this lawsuit.

The case was tried by the Court sitting without a jury. The trial was bifurcated and evidence was heard only on the issue of liability. Damages, if any, are to be determined at a later date.

Having considered all the evidence and the applicable law, the Court finds the 006 patent valid, finds defendants infringed the 006 patent, and renders judgment for the plaintiff on the issue of liability.

I. *The parties*

Alco Standard Corporation ("Alco") is an Ohio corporation, and its Commercial Machine Works ("CMW") division has its principal place of business in Elk Grove Village, Illinois.

Tennessee Valley Authority ("TVA") is a United States corporation with a regular and established place of business on Mitchell Road Extended, Memphis, Tennessee.

Westinghouse Electric Corporation ("Westinghouse") is a Pennsylvania corporation with a regular and established place of business at 5865 Ridgeway Parkway, Memphis, Tennessee.

II. *Relationship of the parties*

Alco originally brought this action under the Tennessee Valley Authority Act, 16 U.S.C. § 831r against TVA for patent infringement as defined by 35 U.S.C. § 271.

Alco also originally asserted a claim against Westinghouse for patent infringement as defined by 35 U.S.C. § 271 and for unfair competition.

Alco is the owner of a United States Letters Patent No. 3,960,006 (hereinafter sometimes referred to as "the patent in suit" or "006 patent") for an ultrasonic bore inspection method and apparatus and has the right to maintain this action. [Pretrial Order, March 8, 1982.] The method and apparatus are alleged to be useful in the detection of flaws in the large turbine rotors present in electric generating facilities.

On the motion of Westinghouse, this Court, Honorable Bailey Brown, Chief Judge, decided on April 4, 1978, that Alco's patent infringement claims against Westinghouse for ultrasonic bore inspections which were performed in conjunction with TVA should be dismissed for failure to state a claim upon which relief may be granted; Alco's remaining patent infringement claims against Westinghouse were dismissed for improper venue; and Alco's pendent unfair competition claims against Westinghouse were also dismissed. *Alco Standard Corp. v. Tennessee Valley Authority*, 448 F.Supp. 1175 (W.D.Tenn.1978).

Westinghouse has undertaken to indemnify and save TVA harmless as to any award of compensation arising out of the use by TVA of the patent in suit as alleged in the complaint.

Westinghouse remains in this case as a third-party defendant as indemnitor of TVA. TVA and Westinghouse sometimes will be referred to herein jointly as "Defendants."

III. *The Invention*

The application for the patent in suit was filed on December 3, 1973, by Robert D. Smith, who was at that time an employee of Commercial Machine Works. On June 1, 1976, U.S. Patent No. 3,960,006 "Non-Destructive Test Apparatus and Method for a Material Having a Cavity Therein" (hereinafter patent or 006) was issued to Mr. Smith who had assigned the patent to Alco Standard.

Patent 006 describes a device and method to be used in the inspection of the large turbine rotors used by utilities to generate power. These metal cylindrical rotors may be more than thirty feet in length and weigh from 25 tons to over 100 tons; they rotate at up to 3600 rpms and operate at temperatures up to 1000° F. The presence of a crack, flaw or inclusion of a material different from the metal of the rotor is a threat to the structural integrity of these rotors. Such cracks, flaws or inclusions (collectively termed "discontinuities") may cause a rotor to catastrophically explode, resulting in loss of human life and immense

property damage. The patented invention purports to provide an improved method and apparatus to ultrasonically inspect a turbine rotor and detect any discontinuities that might lead to structural damage of the rotor. When a discontinuity is detected, personnel skilled in metallurgy and fracture mechanics analyze the data to determine whether the discontinuity poses a threat. If a discontinuity is near the central hollow core (the bore) of the rotor, then the diameter of this internal bore may be enlarged to remove the discontinuity. This overboring of the rotor bore (termed "bottle boring") allows the rotor to be safely returned to service. The detection of serious discontinuities may lead to condemnation of the rotor.

Because a forged turbine rotor has blades affixed to its external surface, the most effective way to examine the massive forging is to inspect the rotor via its central bore. The patented device employs a moveable head or carriage that is inserted into the rotor bore. One or more plexiglass shoes are mounted on the carriage; these shoes are shaped to fit the curvature of the rotor bore and are held against the rotor wall by a pneumatic pressure device. To reduce energy loss and minimize friction between the shoe and the wall of the bore, a couplant (such as water) is used. A source of ultrasonic signals, such as a transducer, is mounted on each shoe. To scan the rotor, the carriage rotates slowly as the transducers continuously transmit and receive ultrasonic signals. An indexing arrangement outside the rotor indicates the axial position (longitudinal penetration) and the rotational position (clock position) of the shoes inside the bore.

More than one transducer may be mounted on a single shoe, and these transducers transmit ultrasonic signals into the rotor forging. The patented device uses three modes of ultrasonic signals—longitudinal, shear and surface—to scan the rotor. As they are transmitted into the rotor, these ultrasonic waves are reflected by either discontinuities within the forging or by the outer surface of the rotor. The reflected ultrasonic waves are received by a pick-up device in the same or a companion transducer and this information is transmitted to a recording or display device.

Through use of this invention, the patent claims that "the precise position of any flaw [in the rotor], the nature of the flaw and an accurate outline of the flaw can be achieved."

IV. *Technical and historical background*

From 1946 to 1956 ultrasonic tests were performed on turbine rotor forgings only from the outside of the rotor, not from the bore, and only on newly manufactured rotor forgings before they were placed in service. By 1957, Westinghouse had assembled a task force and given it the job of improving Westinghouse's ability to inspect rotors ultrasonically. Westinghouse subsequently learned that General Electric had developed a boresonic inspection device, and in 1959 Westinghouse abandoned its development program and purchased boresonic equipment from General Electric. This boresonic rotor inspection device, developed by General Electric and used by Westinghouse, consisted of a single search unit with two transducers, one in the transmitting mode and the other in the receiving mode. The General Electric device was introduced into the bore manually and rotated in a spiral action the full length of the bore. A spring-loaded arrangement held the search unit against the bore. No recording equipment was utilized with this General Electric boresonic inspection device. This boresonic inspection device was suitable only for inspecting newly manufactured turbine rotors before they left the manufacturer's plant; it was not suitable for inspecting rotors after they were placed in service. Westinghouse was still using this General Electric boresonic inspection device as late as 1972.

During the 1950's and 1960's the manufacturers of turbine rotors were acutely aware of the need for a means of inspecting rotors that had been placed into use at the site where they were being used. The available inspection systems necessitated

dismantling the turbine and shipping the rotor back to the manufacturer's plant for reinspection. This created expensive delays for the utility companies since their generating capacity was seriously affected by loss of use of the turbine while inspection was conducted. In an attempt to solve this problem, the three major U.S. turbine and generator manufacturers—Westinghouse, General Electric, and Allis Chalmers—participated in a committee of the American Society for Testing Materials with the aim of improving the methods of testing rotor forgings. By 1967 it became known in the rotor manufacturing industry that General Electric was using a different type of boresonic inspection device; this new General Electric device allowed testing of bottle bored areas. Westinghouse tried to buy General Electric's new inspection equipment, but General Electric would not sell its unit to Westinghouse.

Evidence produced at trial showed Westinghouse had modified the 1959 vintage General Electric equipment in a continued effort to improve its capacity for detecting flaws in rotor forgings. The modified equipment did not, however, give Westinghouse the capacity to perform on-site inspection of in-service rotors. The modified equipment also lacked the desired accuracy and could not inspect bottle bored areas of the bore.

In 1972 Westinghouse again attempted to purchase the newer ultrasonic inspection system from General Electric and General Electric again refused to sell to Westinghouse. About this time Westinghouse renewed its own research and development program in a push to develop an improved means of detecting flaws in turbine rotors. Westinghouse's research and development program encountered frustration and repeatedly failed to meet projected deadlines.

During the summer of 1972, Commercial Machine Works, an equipment repair and on-site machining company, performed bottle boring on turbine generator rotors at the site where the rotors were installed. Prior to this, rotors apparently had to be shipped to a distant location for bottle bor-

ing. By virtue of Commercial Machine Works' involvement in on-site bottle boring, Commercial Machine Works officials became aware that General Electric conducted on-site boresonic rotor inspections, but that Westinghouse lacked the capacity to do so.

Robert Smith, an employee of Commercial Machine Works, had a broad knowledge of ultrasonics; he conceived of a method and device that would accomplish on-site boresonic inspections. Commercial Machine Works contacted Westinghouse to determine if there was a marketing potential for such device, and, as a result, a meeting was held in December, 1972.

The meeting was attended by Robert Smith and Charles Williams, representing Commercial Machine Works, and ten or twelve Westinghouse employees, including Mr. Gilbert Ronca. At this meeting, Mr. Smith worked from sketches to explain his idea and concept. Several of the Westinghouse representatives were enthusiastic about Mr. Smith's idea, but Mr. Ronca indicated that Westinghouse's research and development department had been working unsuccessfully on this problem for a number of years. Mr. Ronca expressed his opinion that Westinghouse had been unable to solve the problem and Mr. Ronca believed Commercial Machine Works would not be able to solve the problem either.

About the time of this meeting, Mr. Smith and Commercial Machine Works contacted Southwest Research Institute, an independent research organization with experience in ultrasonics. Commercial Machine Works contracted with Southwest Research Institute, with Mr. Smith's involvement, to build the boresonic inspection device conceived by Mr. Smith.

In January 1974, Commercial Machine Works again contacted Westinghouse, this time to demonstrate the now-patented boresonic inspection device. Mr. Gilbert Ronca and Mr. R.F. Dinger of Westinghouse traveled to the Commercial Machine Works plant in Elk Grove, Illinois, to see the demonstration. Commercial Machine Works' demonstration of the patented invention,

conducted by Southwest Research Institute personnel, was met with unreserved enthusiasm from the Westinghouse officials. Mr. Ronca reported to his supervisors that the system represented a significant advancement in the field of boresonics and that its incorporated germane contemporary technology developed in conjunction with in-service inspection of nuclear power plants. Just days prior to the January 23, 1974, Commercial Machine Works demonstration, Westinghouse's research and development group had experienced another failure in its effort to develop a boresonic inspection device.

After the Commercial Machine Works demonstration, Westinghouse dismantled its own boresonic research and development program and proceeded to make plans to purchase the patented device. On April 30, 1974, Mr. Dinger, manager of Westinghouse's Steam Turbine Division Quality Engineering, made a midyear capital request to increase the funding by $100,000 for purchase of the patented boresonic test unit. Westinghouse reports show that the Steam Turbine Division Quality Control, Engineering and Service Departments all endorsed the acquisition of the patented device from Commercial Machine Works. Correspondence between Westinghouse personnel R.E. Clark, D.H. Pierce, B.B. Seth and others shows that as late as August, 1974, Westinghouse personnel were still committed to purchasing the Commercial Machine Works boresonic inspection device.

During this time period a turbine rotor at TVA's Gallatin Steam Plant exploded. The June 19, 1974, catastrophic failure of the Gallatin II rotor, manufactured by Westinghouse, resulted in over $5 million of property loss; loss of power generation was estimated at $48 million. Within days of the failure of the Gallatin II rotor, Westinghouse contracted with Commercial Machine Works to inspect the Gallatin I rotor, the sister of the rotor that had exploded. This inspection was conducted at Westinghouse's Lester Plant. The Commercial Machine Works boresonic inspection discovered a discontinuity in Gallatin I in almost the exact location as that which caused the failure of Gallatin II. After Commercial Machine Works removed the discontinuity by bottling boring, Gallatin I was returned to service. Westinghouse later stated that such a boresonic inspection of the Gallatin II rotor would have prevented its catastrophic failure.

Even after Commercial Machine Works' August, 1974, inspection of Gallatin I, Westinghouse was still contemplating purchasing the Commercial Machine Works device. Minutes from a September 24, 1974, meeting between Westinghouse and TVA personnel show that Mr. R.T. Craig of Westinghouse "noted that Westinghouse plans to be more responsible on ultrasonic inspections in the future. They [Westinghouse] plan to either lease or acquire two inspection devices possibly from Commercial Machine Works for future work."

Subsequent to Commercial Machine Works' inspection of Gallatin I, Mr. Ronca prepared a "Request for Approval of Dash 7—Project Covering a Probe Drive Assembly for Boresonic System." In his proposal Mr. Ronca stated:

Several memoranda and a capital expenditure request have been prepared describing the Commercial Machine Works (CMW) Boresonic System. The system is a highly sophisticated package which has capabilities to scan with various ultrasonic wave modes and generates a six-channel strip chart which indicates for each of the three instruments used both the signal amplitude above a gated height and its distance from the bore surface. It has a high degree of positioning and resetting accuracy which is monitored by redundant digital readouts for both its axial and circumferential locations. It has a controllable couplant feed system. In the recent past, the equipment was used to check the TVA Gallatin units at Lester as well as on site. As a result of these inspections, it was concluded that the development of a unit started as a materials technology project D93NDTCU should be continued. This conclusion is

based on observations and test data involving these (CMW) inspections. The examination at the Lester Plant covered the period of July 29, 1974 through August 9, 1974, (12 days including multiple shifts and weekend work) and the examination performed at Gallatin, Tennessee, covered the period of August 11, 1974 through August 17, 1974, (7 days including multiple shifts and weekend work). At Lester the examination was performed by a seven man crew and at Gallatin by a five man crew. At each site the crew included highly skilled ultrasonic and electrical maintenance personnel. In order to effectively comply with the quality requirements being invoked on new as well as service turbine rotors, consideration must be given to the manhours involved. The following request represents cost for a drive assembly which is intended to comply with the engineering requirements and be operationally feasible. Its simpler design is intended to avoid the several days used during the examinations for equipment alignment and calibration.

Based on Mr. Ronca's proposal, Mr. Clark and other Westinghouse employees met and decided to go with Mr. Ronca's proposal to develop a boresonic inspection device. The group decided not to buy the Commercial Machine Works inspection device. This decision was made about October 4, 1974. On October 21, 1974, Westinghouse employee W.E. Rudloff advised employees D. Cumming and T. LaRoe to get "funds to buy 'instant' capability for performing bottle-bore inspection and machining capability." On November 25, 1974, G.B. Harvin, Jr., of Westinghouse's Chattanooga facility, advised Westinghouse's Lester personnel of the possibility that Electric Power Research Institute might help fund development of a boresonic inspection device. Mr. Harvin stated, "as you know, we presently have a 'crash' program going to develop ultrasonic bore inspection techniques by early January 1975." Mr. Ronca testified that Westinghouse performed its first boresonic rotor inspection in late March 1975.

## V. *Infringement*

Plaintiff Alco Standard contends that its system of boresonic rotor inspection is the patented system and that defendants appropriated plaintiff's patented system. Specifically, Alco Standard contends that claims 1, 2, 3, 7, 8 and 10 of the patent have been infringed by TVA's use of Westinghouse's boresonic inspection system.

 The burden of proving patent infringement falls upon the plaintiff alleging infringement. "To find infringement, the Court must determine that every element of a claim alleged to be infringed must be found in the accused device, that the accused device is a copy 'either without variation, or with such variations as are consistent with its being in substance the same thing.'" *American Hoist & Derrick Co. v. Manitowoc Co.*, 603 F.2d 629, 630 (7th Cir.1979) (citations omitted). In determining whether there is literal infringement, the words of the patent claim must be compared with the accused Westinghouse device. If the claim reads directly on the accused device, then literal infringement is established. *Acme Highway Products Corp. v. D.S. Brown Co.*, 473 F.2d 849, 850 (6th Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57 (1973).

Claim 1 of the patent describes a "nondestructive test apparatus for detecting and providing three-dimensional analysis of flaws" in a rotor. This test apparatus is comprised of:

(a) a signal transmitting means (i.e. transducer) to be inserted into the rotor bore; the signal transmitting means includes at least two signal sources that are capable of simultaneously transmitting at least two ultrasonic signals from the bore into the mass of the rotor; the ultrasonic signals are to be selectively chosen from the various ultrasonic modes;

(b) a pickup means that will detect the ultrasonic signals as they are reflected from discontinuities within the rotor;

(c) a position determining means that provides for direct correlation of the information gained from the reflected and unreflected signals in the various modes; this position determining device precisely locates in a three dimensional matrix the path of each ultrasonic signal transmitted into the rotor;

(d) a recording means for preserving the information content of the reflected ultrasonic signals in a fashion that permits combining their individual information content to derive an accurate indication of the existence, position, nature, size and shape of flaws in the rotor material.

Claim 2 of the patent states that the apparatus described in Claim 1 simultaneously transmits ultrasonic signals in different modes.

Claim 3 states that the apparatus is comprised in part of:

(a) a moveable carriage that is inserted into the rotor;

(b) a drive means to longitudinally advance the carriage into the bore and independently rotate the carriage;

(c) two sources of ultrasonic signals transmitting ultrasonic signals simultaneously in two modes into the mass of the rotor;

(d) a means of picking up ultrasonic signals reflected from discontinuities within the rotor mass;

(e) an indexing means to correlate the information gained from reflected signals with the position of discontinuities within the rotor material;

(f) a means for recording and preserving the information in a fashion that permits combining the individual information of each mode to derive an accurate indication of the existence, position, nature, size, and shape of flaws in the rotor material.

Patent claims 7, 8, and 10 are method claims. Claim 7 deals with transmitting more than one mode of ultrasonic signals, detecting the reflected signals, identifying the reflected signal with the corresponding transmitted signal, correlating the information content of transmitted or reflected signals from one mode with that of another mode, and combining the information content of the transmitted and reflected ultrasonic signals in the different modes to derive an accurate indication of the position, nature, size and shape of the flaws in the rotor material. Claim 8 deals with the same steps but particularly specifies the use of a first source of ultrasonic signals (first transducer) transmitting a first mode of signals and a second source of electronic signals (second transducer) transmitting a second mode. Claim 10 adds the step of repeating the process described in claim 8 at a subsequent time to determine if flaw removal has been successful or if flaw characteristics have changed over a period of time.

Like the patented apparatus described in claims 1, 2 and 3, Westinghouse's device also provides for the non-destructive testing of rotors via the insertion of an ultrasonic inspection apparatus into the rotor bore. The Westinghouse device consists of a search head with three ultrasonic transducers mounted on a carrier bar. As does the patented device, the Westinghouse apparatus uses pressure to hold the transducers against the bore surface and uses a couplant between the transducer and the rotor bore surface. The Westinghouse device ultrasonically scans the rotor interior as the search head travels in small increments along the rotational axis of the bore. The three transducers operate simultaneously at two different frequencies and with varying orientation and echo modes. The ultrasonic waves are transmitted by these transducers into the rotor material and are reflected by any discontinuities within the rotor. Such reflected waves (echoes) are recorded along with the axial and circumferential position of the head. The Westinghouse device makes two scans of the bore; each scan uses a different frequency of ultrasonic signals and three transducers are used simultaneously for both scans. The recorded ultrasonic find-

ings are cross-checked by an analyst who plots the location, orientation and size of any discontinuities. Fracture mechanics analysis is then used to determine the relative significance of a discontinuity.

As these descriptions show, the alleged infringing device appears to closely parallel the patent claims. Defendants, however, contend plaintiff did not present any evidence to prove that Westinghouse used a method or apparatus covered by any of the patent claims to inspect TVA rotors. The plaintiff contends Westinghouse's manual entitled "Westinghouse Steam Turbine Rotor Inspection Programs" (hereinafter "Blue Book"), as well as Westinghouse's answer to Plaintiff's Interrogatory 39, provide proof of the nature of Westinghouse's infringing device.

In its answer to Plaintiff's Interrogatory 39, Westinghouse stated that it used a bore inspection system "similar" to that described on pages 15–17 of the Blue Book to inspect TVA rotors. Furthermore, a letter of December 8, 1975, from Westinghouse's Steam Turbine Division Service Sales to Westinghouse sales personnel in Chattanooga, described Westinghouse's boresonic inspection system in language almost identical to that used in the Blue Book. Since this letter was written in response to TVA's criticism of the cost of Westinghouse's boresonic examination of turbine rotors in the field, it can be inferred that the system of boresonic inspection described in the letter was the system used by Westinghouse to inspect TVA rotors. Thus, the Court finds plaintiff introduced highly credible evidence, from two separate Westinghouse sources, that describes Westinghouse's device for and method of boresonically inspecting turbine rotors. Neither defendant introduced any evidence to discredit or rebut plaintiff's proof that the method and apparatus described in both the Blue Book and the letter were the same method and apparatus used by Westinghouse to ultrasonically inspect TVA's rotors. The Court finds it has been established by competent and credible evidence that Westinghouse used the boresonic inspection method and apparatus described in both the Blue Book and the December 8, 1975, letter to inspect TVA's rotors.

Having determined that the boresonic inspection device described in the Blue Book and the December 8, 1975, letter is the system used by Westinghouse to inspect TVA's rotors, the Court must address defendants' contention that the described device is not so similar to the patent claims as to infringe the patent. Defendants seek to distinguish the Westinghouse device from the patented device on two grounds: (1) because of its use of gating, the Westinghouse device does not use multiple modes of ultrasonic beams throughout the mass of the rotor material; and (2) Westinghouse does not "correlate" or "combine" data to derive an "accurate indication of the existence, position, nature, size and shape of flaws" in the rotor material. The Court has considered each of these contentions separately and finds both contentions lack merit.

In scanning the mass of a rotor, the Westinghouse device uses electronic "gating," a technique of selecting for recording only a certain portion of the reflected ultrasonic waves. The surface of the rotor bore and the exterior surface of the rotor normally reflect ultrasonic waves. To facilitate the location of reflections caused by discontinuities within the rotor, the reflection times are "gated" so that only the ultrasonic reflections from just beneath the rotor surface to just beneath the exterior surface are recorded. Additionally, Westinghouse makes two separate scans of the bore, a shallow scan for echoes from near the bore out three to eight inches into the rotor, and a deep scan for echoes from about three inches to thirteen inches out from the bore surface. Gating is used to differentiate these two scans, and a different frequency of ultrasonic signal is used for each scan.

The defendants contend that by gating the Westinghouse device does not scan the entire mass of the rotor, whereas the patent claims state that ultrasonic signals are transmitted into the mass of the rotor ma-

terial and echoes are picked from discontinuities *throughout the mass* of the rotor material. The defendants claim the gating procedure electronically blocks the transducers from interrogating any more than the specific "shallow" or "deep" area being scanned. The defendants further contend the gating technique requires Westinghouse to make at least two scans in order to test a rotor. Since Westinghouse used electronic gating in its inspection of TVA's rotors, the defendants contend that the *entire* mass of the rotor was not interrogated *throughout*, and, thus, no infringement occurred.

The Court finds this argument is without merit. There is no indication in either the testimony or the evidence at trial that the patented device interrogated rotors in one continuous scan rather than in two or more scans. Nor was there evidence that the term "throughout the mass of the rotor material" implies that only one scan is used. The Court finds no distinction between the terms "throughout the mass of the rotor material" as used in the patent and Westinghouse's specifications for the inspection of rotors. Westinghouse's description of its inspection system states that "[t]he ultrasonic inspection of rotors basically consists of passing three ultrasonic transducers *through the bore* of the rotor. The *interior of the rotor* is scanned with sound waves." The patent Summary of Invention points out that the use of all three modes of ultrasonic waves can be simultaneous or in successive steps; nowhere does the patent claim to do a complete test with only one scan of the rotor. In fact, the patent states that it is desirable to perform two separate test sequences, one sequence using a shear mode and a longitudinal mode and a second sequence using a surface mode and a longitudinal mode. The Court finds that if the gating technique utilized by Westinghouse is a variation of the patented device, it is a variation consistent with its being in substance the same as the patented technique. *American Hoist & Derrick Co., supra*, 603 F.2d at 630.

Second, the defendant argues that, unlike the patented device, the Westinghouse device does not "combine" and "correlate" data "to derive an accurate indication of the existence, position, nature, size and shape of flaws in the rotor material." In its answer to Plaintiff's Interrogatory 26, Westinghouse stated that "Except in situations where gross discontinuities may occur, there is no correlation or combination of the informational content of the various ultrasonic modes by Westinghouse." Westinghouse, therefore, has conceded that it does on occasion correlate or combine information content of the various ultrasonic modes. If Westinghouse correlates or combines such data at all, then the Court must necessarily conclude that the Westinghouse device possesses the means to correlate and combine. Since only the capacity to correlate and combine is necessary to meet the language of patent claim 3, Westinghouse has infringed claim 3. Furthermore, the evidence shows that Westinghouse believed its system capable of accurately indicating the existence, position, size and shape of flaws in the rotor mass. For example, Westinghouse stated that its techniques of varying the transducers' orientation and mode of ultrasonic signals enable its device to "improve detection of cracks regardless of their orientation" and "improve accurate location of flaws." Varying the transducer orientation and ultrasonic mode "is essential ... to insure that flaws varying in size, location and orientation [are] detected ... Precise knowledge of the exact location, size, and orientation of any flaw is essential to the fracture mechanics analysis used to determine the relative significance of the flaw." This is an echo of the 006 patent's claims.

The defendants contend the plaintiff presented no evidence that Westinghouse had rescanned TVA rotors, and therefore, infringement of claim 10 has not been proven. This contention ignores the fact that in its answer and supplemental answer to Plaintiff's Interrogatory 2, filed with the Court, TVA admitted at least six TVA rotors had been boresonically reinspected by Westinghouse as of early 1980. By con-

ducting such reinspections the defendants have infringed claim 10 of the patent.

█ Based on the evidence presented, the Court finds plaintiff Alco Standard has met its burden of proving infringement. The Court finds the accused Westinghouse device contains every element found in claims 1, 2, 3, 7, 8 and 10 of the 006 patent. The Westinghouse device is, in the Court's opinion, a "copy ... either without variation, or with such variations as are consistent with its being in substance the same thing" as the patented device. *Englehard Industries, Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 351 (9th Cir.1963) (quoting *Burr v. Duryee*, 1 Wall. (68 U.S.) 531, 573, 17 L.Ed. 650 (1863)). The Court finds Westinghouse utilized its infringing device to inspect and reinspect turbine rotors for defendant TVA.

## VI. *Validity of the 006 patent*

Defendants contend the 006 patent is invalid, therefore defendant Westinghouse's boresonic inspection device cannot have infringed the patented device. In determining the validity of a patent, there are essentially three elements: novelty, utility and non-obviousness. *Westwood Chemical, Inc. v. Owens-Corning Fiberglas Corp.*, 445 F.2d 911, 914 (6th Cir.1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972). These three requirements are codified in 35 U.S.C. §§ 101–103.

█ Every patent issued by the patent office carries a presumption of validity, 35 U.S.C. § 282, which is justified by the "complexities of patent law and the expertise of the patent office." *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964). This presumption is greatly strengthened where the most pertinent prior art has been considered by the patent office. *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420 (6th Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971). *See also Great Lakes Equipment Co. v. Fluid Systems, Inc.*, 217 F.2d 613, 617 (6th Cir.1954).

Where the prior art is not so considered the presumption is weakened. *Smith v. ACME General Corp.*, 614 F.2d 1086, 1090–91 (6th Cir.1980). In the present case, the defendants' expert witness testified the most pertinent prior art was the boresonic inspection device developed by General Electric. In analyzing the 006 patent application, the patent office considered General Electric's system of ultrasonic rotor inspection as prior art. The Court therefore accords the patent the statutory presumption of validity. For a more complete discussion of whether the patent examiner considered pertinent prior art see Section VII, B, 1 *infra*.

█ The presumption of validity under 35 U.S.C. § 282 has no independent evidentiary value, however; its purpose is merely to allocate the burden of proof of invalidity to the party asserting it. *Eltra Corp. v. Basic, Inc.*, 599 F.2d 745, 750 (6th Cir.) (citations omitted) (footnote omitted), *cert. denied*, 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979); *Reynolds Metals Co. v. ACORN Building Components, Inc.*, 548 F.2d 155, 160 (6th Cir.1977).

### A. *Novelty*

█ The novelty of a patent is covered by 35 U.S.C. § 102, which provides in part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ...

The defense of novelty is set forth by claiming the patented invention is not new or is already in use by another. "Novelty does not exist if the patented device has been anticipated by a prior device, whether

patented or not." *Monroe Auto Equipment Co. v. Heckethorn Manufacturing and Supply Co.*, 332 F.2d at 414. If it is proved the patented invention lacks novelty, then the patent is considered to have been erroneously issued, and the patentee cannot base a claim of infringement upon it.

The defendants first contend the patented invention lacks novelty because a prior printed publication anticipated the invention. In order for a prior printed publication to anticipate an invention, the description thereof must disclose the complete and operative invention "in such full, clear and exact terms as to enable any person skilled in the art or science to which the invention appertains, to practice the invention." *Ballentyne Instruments & Electronics v. Wagner*, 345 F.2d 671, 674 (6th Cir.1965). The defendants contend an article published in 1963 entitled "Ultrasonic Inspection of the Nimrod Power Plant Alternator Rotors" (hereinafter the Nimrod article), anticipated the patented invention and thus the patent is invalid.

The Nimrod article describes a device for ultrasonically inspecting large alternator rotors by inserting a probe unit into the rotor bore. Two transducers are mounted on the probe head and a spring-loaded mechanism holds the probe head against the rotor wall; an oil couplant is used between the transducers and the bore surface. The probe unit can be fitted with one of four different types of probes: a longitudinal vertical, a 45° shear wave, a surface wave to search along the bore or a surface wave to search around the bore. A rack and pinion drive advances the probe head longitudinally from one end of the bore to the other. The rotor is then rotated 5° and the probe unit is again driven the full length of the rotor. By successive rotations of the rotor, the rotor's entire 360° is inspected. During each longitudinal pass through the bore, the scanning head remains in a fixed rotational position. The one transducer on the probe head transmits one mode of ultrasonic waves, these waves are reflected and picked up by a second transducer located on the probe head. The

data is displayed for the operator to view and an auxillary cine camera records the data. To enable comparison between two separately exposed lengths of cine film, two film editors are mounted in such a way that the operator can view both lengths of film at the same time.

Although there are some likenesses between the device described in the Nimrod article and the patented device, the Court finds the Nimrod article does not anticipate the patented device. Anticipation requires that "all the elements of a patented device or their equivalents be found in a single pre-existing structure or description." *American Seating Co. v. National Seating. Co.*, 586 F.2d 611, 618 (6th Cir.1978) (citations omitted). Unlike the patented device, the Nimrod device does not teach simultaneous scanning with multiple transducers nor does it utilize multiple ultrasonic modes during a scan of the rotor. The Nimrod article speaks of comparing two separate lengths of 16 mm film and does not teach combining or correlating the information content of ultrasonic signals from the various modes. This is a significant difference from the patented invention. Furthermore, the Nimrod device traverses the length of the rotor bore but does not rotate around the internal circumference of the bore as does the patented device. In contrast, the patented device does rotate circumferentially around the bore while traversing the length of the bore. The fact that the Nimrod inspection device is circumferentially stationary while the rotor is rotated is significant because it reveals a difference in the structure of the two devices and also because field inspection of turbine rotors would be highly impractical if the inspection device did not rotate while the rotor remained stationary. Based on these differences, the Court finds the patented device was not anticipated by the Nimrod article.

In a second argument defendants contend the patented device lacks novelty because it generates only the same type of A-scan data that is generated by prior art.

A-scan data, defined by defendants' expert witness Professor Serabian to mean "amplitude time," is a factor of pulse-echo electronics that involves transducer location, distance and size. The testimony shows both the patented device and prior art generate A-scan data. This alone, however, is not enough to compel a finding that the patented device lacks novelty. The issue is not what type of data is generated, since the proof showed many types of ultrasound inspection equipment generate A-scan data. Rather, the issue is how the A-scan data is generated, manipulated, assembled, recorded, combined or correlated. As the preceding paragraph shows, the Court finds the patented device does generate and utilize the A-scan data in a novel way not provided for in either the Nimrod device or in any other prior art presented by defendants.

■ Thirdly, defendants contend the patented device lacks novelty because it was anticipated by the activities of Southwest Research Institute and others in the area of ultrasonic inspection of nuclear reactor nozzles. The Court finds that none of the nuclear reactor ultrasonic inspection devices contain the elements of the patented device or their equivalents so as to render the patented device non-novel. A technical report "In-Service Inspection Program for Nuclear Reactor Vessels" (hereinafter Technical Report), edited by Southwest Research Institute, summarized the work done by Southwest Research Institute for the Edison Electric Institute and TVA through February, 1970. The defendants contend the Technical Report revealed ultrasonic inspection devices and techniques that negate the novelty of patent 006. The internal diameter of the nozzles in Project I ranged from eight inches to sixteen inches while the internal diameter of turbine rotors is about four to five inches. Although the device used to inspect the sixteen inch diameter nozzle used three transducers, the devices used for the eight inch and ten inch diameter devices contained only one transducer. These devices do not provide for the simultaneous transmission of three modes of ultrasonic waves. Uncontradicted evidence at trial showed that none of the methods or devices used in the ultrasonic inspection of nuclear reactor nozzles provided for the combination of information from different modes for analysis. Furthermore, Southwest Research Institute's ultrasonic inspection of the San Onofre nuclear nozzle was immersion testing, not the contact testing that the patented device utilizes. Based on these differences the Court finds the defendants have failed to meet their burden of proof by establishing that "all of the elements of the patented device or their equivalents" can be found in any single pre-existing device to ultrasonically inspect nuclear reactor nozzles.

## B. *Non-Obviousness*

■ The defendants contend that claims 1, 2, and 3 of plaintiff's patent lack non-obviousness and are therefore invalid. Even if prior art does not identically disclose or describe the patented device so as to establish that the device lacks novelty, prior art may establish that the patented device was obvious.

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. To render an invention obvious under section 103, an element of prior art does not have to precisely duplicate the patented invention. Rather, "it is sufficient that the subject matter of the patented article, taken as a whole, has been disclosed by the prior art." *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 538–39 (7th Cir.1975).

The United States Supreme Court has set out the approach to be followed when considering the issue of obviousness:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and

the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Only after making these express factual findings should the ultimate question of obviousness be resolved. *Sakraida v. Ag Pro., Inc.,* 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976).

1. *Presumption of validity—failure to consider pertinent prior art*

■■■ The basic statutory presumption is that a patent is valid. 35 U.S.C. § 282; *Eltra Corp. v. Basic, Inc.,* 599 F.2d at 750 (citation omitted). Here defendants contend that some pertinent prior art was not cited to the patent office and that this failure weakens the statutory presumption of validity. Although the presumption that a patent is valid "may be weakened by the failure of the Patent Office to consider all pertinent art, the degree by which it is weakened depends on a balancing of the pertinence of the newly cited art with the pertinence of the art considered by the Patent Office." *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193, 1196 (6th Cir. 1974).

Despite this contention, defendants' witnesses did not offer any testimony explaining how the prior art made the patented invention obvious to one possessing ordinary skill in the pertinent art. In an effort to unravel the issue, the Court has considered the technical articles and patents introduced by defendants as pertinent prior art not cited to the patent office, as well as those patents cited by plaintiff to the patent office. Defendants did not present any evidence demonstrating why the art not cited to the patent office was more relevant

or more pertinent than the art cited to the patent examiner, and the Court has found no ground for such a conclusion. Both the cited and uncited prior art include devices that use multiple transducers to simultaneously transmit multiple modes of ultrasonic signals. Both cited and uncited prior art include devices for ultrasonically inspecting nuclear reactor vessels. Defendants did not present evidence to show that the uncited Nimrod device was any more pertinent to the plaintiff's invention than was the cited General Electric boresonic rotor inspection apparatus.

■■■ The Court finds defendants failed to show that the uncited prior art was more relevant than the cited art. Furthermore, the Court finds the presumption of the patent's validity was not weakened by the fact that the patent office did not consider the prior art introduced at trial by defendants.

■■■ Additionally, the uncontradicted testimony of defendants' expert witness Dr. Serabian established that the most pertinent prior art was the boresonic inspection system developed by General Electric. This prior art was before the patent examiner who issued the 006 patent. Because the most pertinent prior art was considered by the patent office, the statutory presumption of the 006 patent's validity is greatly strengthened. *Bolkcom v. Carborundum Co.,* 523 F.2d 492, 498 (6th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *Tapco Products Co. v. Van Mark Products Corp.,* 446 F.2d at 426.

■■■ The Court recognizes, of course, that the statutory presumption of validity has no independent evidentiary significance, "it merely serves to allocate to the party claiming invalidity the burden of proving it .... In the typical case such as this, where the bulk of the evidence of the prior art is contained in documents, the party claiming obviousness need only do so by a preponderance of the evidence." *Eltra Corp. v. Basic, Inc.,* 599 F.2d at 750 (footnote omitted) (citations omitted).

## 2. *Scope and content of prior art*

The defendants introduced into evidence several patents and publications, not cited to the patent examiner, as prior art establishing non-obviousness. To fulfill *Graham's* requirement that the scope and content of prior art be determined, a brief summary of the more pertinent of these follows.

1. The Nimrod article, described in section VI, B, *supra,* was presented in 1963 at the International Conference on Non-Destructive Testing in London. It described a method and apparatus for ultrasonically inspecting an alternator rotor from the bore.

2. The Gibbs patent (U.S. Patent No. 3,575,044), issued April 13, 1971, entitled Ultrasonic Inspection System for Welds, used multiple transducers in more than one mode to ultrasonically scan welds in large structures such as pressure vessels.

3. The Bradfield patent (Great Britain Patent Number 664,763), issued January 9, 1952, entitled Method of and Apparatus for Examining Materials by Ultrasonic Irradiation, explained the use of multiple transducers utilizing longitudinal and shear ultrasonic waves to examine the properties of materials and locate discontinuities in the mass of a material.

4. The Cowan patent (U.S. Patent No. 3,415,110), issued December 10, 1968, presented a device for ultrasonic inspection of solid metal materials such as railroad ties. This invention consisted of two ultrasonic search units positioned over each rail. Each search unit contained three transducers which transmit multiple modes of ultrasonic waves. The ultrasonic waves reflected from the rail were processed through amplifiers, gate amplifiers and correction circuits. Each channel counted pulses from the direct reflections or counted the loss of reflections so as to alarm upon a discontinuity of a preset length. Each alarm was then recorded on another counter tube so the resulting three channels provided an operator with information as to the size and type of defect.

5. Printed publications by Posakony, Baez et al., Keller et al., and Lautzenheiser presented methods of and devices for inspection of in-service nuclear reactor vessels. Multiple modes and multiple transducers were utilized in one or more search units to ultrasonically scan welds. Different devices were adapted to inspect circumferential and vertical welds, nozzle welds and studs. Some of these devices provided for the recording of data. Inspections were conducted from both the inner and outer diameter of various vessels.

6. The Gunkel patent (U.S. Patent No. 3,221,544), issued December 7, 1965, is entitled Ultrasonic Inspection System. It taught a device to detect and analyze defects in tubular articles such as pipes. The device inspected pipes from the outer diameter. Multiple transducers transmitted ultrasonic signals as the pipe was rotated spirally past the patented device.

Additionally, the Court has considered the materials cited to the patent examiner.

The Court finds that several elements of the patented device can be found both in prior art cited to the patent examiner and in prior art not cited to the patent examiner. Defendants rightfully contend that some of the prior art not considered by the patent examiner utilizes multiple transducers simultaneously transmitting multiple modes of ultrasonic waves. Moreover, defendants' expert witness in ultrasonics, Dr. Steven Serabian, testified that at least two, perhaps three, of the prior works of art considered by the patent examiner show the simultaneous use of multiple transducers in multiple modes. In fact, Dr. Serabian stated that the simultaneous use of multiple transducers in multiple modes dates back to at least the early 1960's and was well-known in the industry at the time the 006 patent application was filed. This alone does not make the 006 patent obvious.

The uncontradicted testimony of defendants' ultrasonics expert Dr. Serabian also established that none of the prior art not cited to the patent office teaches combining the information content of the various

modes of unreflected and reflected signals, as does the 006 patent. The Court finds that prior art cited to the patent examiner also did not describe the correlation of the information content of the reflected and unreflected ultrasonic signals. Such combining is an integral element of 006 patent's claims 1, 2 and 3.

Other differences between the 006 claims and the prior art produced by defendants include: The patented device transverses the internal bore of the material being inspected both axially and circumferentially and accomplishes the inspection from the internal diameter of the item being inspected. The Gunkel device remains stationary while the subject material is moved; it inspects the subject material from the outer diameter. The Bradfield patent teaches no device or method for inspecting any particular mass or material. The Nimrod device does not provide any means to rotationally advance the inspection device through the internal diameter of the material being inspected. Most of the prior art concerning the inspection of nuclear reactor vessels, nozzles and welds (Posakony, Baez, Keller, Gibbs, Lautzenheiser, and San Onofre) involve mounting an ultrasonic device on tracks or rails attached to the object being inspected. Many of these inspections were accomplished from the exterior of the object, unlike the patented method. Many of the nuclear inspection devices utilized immersion testing, which is not practical for on-site inspection of rotors. The Cowan patent describes an apparatus and method for inspecting solid materials (such as railroad ties), not materials having a cavity therein, as does the 006 patent.

3. *Ordinary skill in the art*

In order to resolve the issue of obviousness, the Court must also determine the level of ordinary skill in the art. "The usual way of determining 'the level of ordinary skill' in a particular art is by referring to the subjective reaction of a person thoroughly familiar with the particular art and, if possible, one who practiced the art at the crucial time in question." *Paper Converting Machine Co. v. Magna-Graphics*

*Corp.*, 680 F.2d 483, 496 (7th Cir.1982) (citation omitted). The field of ultrasonics is extremely broad and encompasses areas (such as medical research) that are far afield from the inspection of large metal forgings. The Court looked to non-destructive testing and the ultrasonic inspection of subject matter similar to turbine forgings in ascertaining the ordinary level of skill in the pertinent art.

Mr. Gilbert Ronca, an employee of Westinghouse Corporation from January, 1972, through the time of trial, appeared to the Court to be a person thoroughly familiar with the particular art and a person who practiced the art at the time of the 006 patent application. Prior to being hired by Westinghouse, Mr. Ronca was employed for twenty years by Midvale Heppenstall Company, a manufacturer of heavy forgings. There he initiated a group to conduct non-destructive testing, primarily ultrasound, on forgings, and became engineer of tests. Mr. Ronca is a member of the American Society for Testing Materials (ASTM) and was chairman of ASTM's Special Task Force on Large Generator Rotor Forgings from 1962 to 1976. The task force's responsibility, as stated by Mr. Ronca at trial, was to set out uniform specifications for ultrasonic examination of turbine and generator forgings. When Mr. Ronca was hired by Westinghouse January 2, 1972, Westinghouse was using a boresonic inspection device developed by General Electric. Within six months of being hired by Westinghouse, Mr. Ronca was given important responsibility in Westinghouse's boresonic research and development program. The purpose of this program was to develop improved boresonic inspection capacity. Mr. Ronca testified that this Westinghouse research and development program failed to meet January, 1973, October, 1973, and December 1973, target dates for development of an improved boresonic rotor inspection device.

On January 23, 1974, after these failures, Mr. Ronca and Mr. R.F. Dinger, also a Westinghouse employee, met with representatives of Commercial Machine Works

(CMW) to view the boresonic inspection device developed by Robert Smith and the subject of the patent in suit. Mr. Ronca testified that after the demonstration of the patented device, Mr. Ronca and Mr. Dinger agreed to recommend that Westinghouse purchase the device. Mr. Ronca further testified that after the CMW demonstration, Westinghouse abandoned its own boresonic research and development program. Upon conclusion of the CMW demonstration, Mr. Ronca reported to his superiors at Westinghouse that the patented boresonic inspection "system represents a significant advancement in the field of boresonics and that it incorporates germane, contemporary technology developed in conjunction with in-service inspection of nuclear power plants." At trial Mr. Ronca was given an opportunity to recant his enthusiastic 1974 evaluation of the patented device; he declined to do so.

The Court also notes that at trial Mr. Ronca testified he was a charter member of the Pressure Vessel Research Committee and was familiar with the research done in the ultrasonic inspection of nuclear reactor vessels. Mr. Ronca had, prior to February of 1972, visited Southwest Research Institute to see the sophisticated, remote control, multimode scan inspection system designed by Southwest Research Institute. Even with his awareness of the Southwest Research Institute system and other systems for inspection of nuclear vessels, and with his more than eighteen months' work in Westinghouse's research and development program, Mr. Ronca found the patented system a "significant advancement" in the field of boresonics.

Further evidence of the ordinary level of skill in the pertinent art is Southwest Research Institute's proposal for "Development of Ultrasonic Devices to Detect Cracks in New and Used Steam Turbine Hollow Shafts." In June, 1971, (more than a year before being approached by inventor Robert Smith), Southwest Research Institute developed, at the request of Allis Chalmers Manufacturing Company, a method of detecting cracks in turbine forgings with as little disassembly of the turbine as possi-

ble. Although Southwest Research Institute acknowledged the benefits of conducting such inspections from the bore of the turbine rotor, the Southwest Research Institute system provided for inspection from the rotor's outer diameter. The Southwest Research Institute system required that the rotor's outer surface be exposed and the rotor itself had to be turned so the entire periphery could be examined. A single search unit was used. Multiple transducers simultaneously transmitting multiple modes of ultrasonic waves were not mentioned in Southwest Research Institute's proposal.

Evidence and testimony at trial established that Southwest Research Institute is well-known for its research and development in ultrasonic inspection of nuclear reactors, welds and nozzles. Because Southwest Research Institute assisted Mr. Smith in the design and development of the patented invention, defendants contend the patented device was built from technology previously developed by Southwest Research Institute. Defendants contend Southwest Research Institute's use of its prior concepts renders the patented device obvious. If, however, the patented invention had been obvious, then surely Southwest Research Institute would have utilized the same techniques in designing the ultrasonic turbine inspection device for Allis-Chalmers. That the system designed by Southwest Research Institute for Allis-Chalmers did not remotely resemble that of the 006 patent is further evidence to the Court that the patented system was not obvious to one of ordinary skill in the art.

4. *Secondary considerations*

■ When considering the issue of obviousness, a court must not only determine: (1) the scope and content of prior art; (2) differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. The Court should also consider "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc." *Graham v. John Deere Co.,* 383 U.S.

**152**

at 17, 86 S.Ct. at 693. It is true these secondary considerations cannot be the basis for validating a patent which is lacking in invention, *Deere & Co. v. Sperry Rand Corp.*, 513 F.2d 1131, 1133 (9th Cir.), *cert. denied*, 423 U.S. 914, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975).

It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included. Thus evidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. *In re Sernaker*, 702 F.2d 989, 217 USPQ 1 (Fed. Cir.1983) citing *In re Fielder and Underwood*, 471 F.2d 640, 176 USPQ 300 (Cust. & Pat.App.1973), *see In re Mageli et al.*, 470 F.2d 1380, 1384, 176 USPQ 305, 307 (Cust. & Pat.App.1973) (evidence bearing on issue of nonobviousness "is never of 'no moment', is always to be considered and accorded whatever weight it may have.") Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir.1983). As the Court of Customs and Patent Appeals has noted, evaluating "such secondary considerations may serve to 'guard against slipping into hindsight' and 'to resist the temptation to read into the prior art the teachings of the invention in issue.'" *Stevenson v. International Trade Commission*, 612 F.2d 546, 553 (C.C.P.A.1979).

(a) *Long felt, unsolved needs:* The evidence is overwhelming that for well over a decade the industry had searched for a reliable method of detecting discontinuities in rotor forgings. Mr. J.A. Pratt, manager of Westinghouse's Large Turbine Engineering Metallurgical Section, in June, 1963, wrote to W.G. Clark, an engineer in Westinghouse's Research and Development Center, Metallurgy Department. Mr. Pratt's letter stated in part:

> Specifically, search units to examine rotors from the bore surface are and have been a need for many years. We can and will use such units when they are available to us. The urgency is long past, as Mr. Greenberg knows, and we can no longer express our need in terms of days, months, or years. There have been many times in the past when we could have effectively used such units. The specific type of wave propagation is a matter for you to decide but it must have the ability to expose minute surface and subsurface cracks, such as produced by creep as well as larger imperfections as currently experienced in rotor forgings. The circumstances under which we would use bore search units would include new rotor examination as well as in-service rotors either in the field or in Westinghouse shops. The bore diameters involved will range from 2″ to 10″ as nominal sizes however, there are many "bottle" bores which may exceed this maximum.

At the time the letter was written Westinghouse was utilizing the boresonic device developed by General Electric.

Mr. Gilbert Ronca, Mr. Robert Renner and others testified that Westinghouse's purchase of the General Electric's boresonic inspection unit had not resolved the need for a reliable means of detecting discontinuities in in-service rotors. In August, 1973, TVA requested that the feasibility of field inspection of turbine bores be discussed at an upcoming TVA-Westinghouse meeting. Until the 1974 demonstration of the patented device, Westinghouse continued to expend personnel and funds toward resolution of such need.

The catastrophic failure of the Gallatin II rotor and the reaction of the utility industry, rotor manufacturers and TVA to that rotor failure underscored the urgency of the situation. Testimony from Mr. Robert E. Beck, a TVA employee, established that at least as early as the Gallatin failure and

for at least a year thereafter TVA was rather insistent that Westinghouse obtain the capability to do on site ultrasonic bore examination of in-service rotors.

(b) *Failure of others*—Implicit in the preceding discussion of unsolved need is that major turbine manufacturers had tried and failed to develop a reliable method of inspecting in-service turbine rotors. In 1972, upon first hearing of Mr. Smith's plan for a boresonic inspection device, Mr. Ronca stated Westinghouse had been working on this problem for a number of years, Westinghouse had not been able to resolve the problem, and Mr. Ronca did not think Mr. Smith and Commercial Machine Works would be able to resolve it either. "When others in the field say 'it won't work,' that fact is strong evidence that whatever does work would have been nonobvious." *Nickola v. Peterson*, 580 F.2d 898, 913 (6th Cir.), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1978) (citation omitted).

■■■ The existence of an important problem in the art which has remained unsolved for a long period, despite continued efforts and a series of refinements of the art, until a new combination of concepts produces a solution, is evidence that the combination was not obvious. *See Shaw v. E.B. & A.C. Whiting Co.*, 417 F.2d 1097, 1104 (2d Cir.1969), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970). This case falls under the rule that:

> [i]f those skilled in the art are working in a given field and have failed after repeated efforts to discover a particular new and useful improvement, the person who first makes the discovery does more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to the protection as an inventor.

*McCullough Tool v. Well Surveys, Inc.*, 343 F.2d 381, 399 (10th Cir.1971), *cert. denied*, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). See also *A.E. Staley Manufacturing Co. v. Harvest Brand, Inc.*, 452 F.2d 735, 738 (10th Cir.1971), *cert.*

*denied*, 406 U.S. 974, 92 S.Ct. 2415, 32 L.Ed.2d 674 (1972).

As the Second Circuit in *Timely Products Corp. v. Arron*, 523 F.2d 288, 294 (2d Cir.1975) observed:

> We can conceive of no better way to determine whether an invention would have been obvious to persons of ordinary skill in the art at the time than to see what such persons actually did or failed to do when they were confronted with the problem in the course of their work. If the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials, it is difficult to see how a court could conclude that the invention was "obvious" to such persons at the time.

(c) *Commercial success*—When asked how many bore inspections Commercial Machine Works had conducted, Mr. James R. Wallace, manager of inspection services for Commercial Machine Works and a Commercial Machine Works employee since 1974, testified that closer to a hundred such inspections had been conducted. Mr. Charles Williams, president of Commercial Machine Works and a Commercial Machine Works employee since 1969, testified that from inspection of the Gallatin rotor in the fall of 1974 to early 1976 Commercial Machine Works conducted about twenty boresonic inspections for Westinghouse. Additionally, Mr. Williams testified that Commercial Machine Works had conducted boresonic inspections for Consolidated Edison & Niagra Mohawk. The Court infers further evidence of the patented invention's commercial success from a March 23, 1977, memo titled Bore Exam Competitor. The memo's cover letter from R. Batey, manager, Westinghouse's Power Systems Domestic Negotiations, stated in part:

> Attached is a draft of a specification [for rotor interior inspections] to be sent to the field to assist them in meeting competition from Commercial Machine

Works (and to explain price differences between [Westinghouse] and General Electric).

This is not intended to be a complete process specification. The intent is to:

(a) Discourage customers from taking quotes from Commercial Machine Works.

(b) If customers do get a Commercial Machine Works quote, then we want the customer to get Commercial Machine Works to quote our specifications.

(c) If Commercial Machine Works still gets the job, then we want to build a basis to show the customer why Commercial Machine Works should not again get the job.

A March 7, 1978, letter from Mr. Jose Saez, the Detroit Edison engineer responsible for turbine maintenance, indicates his perceptions of the patented device. Mr. Saez was writing to Mr. Frank Agosti, assistant general superintendent of Detroit Edison's maintenance department. Upon learning that Westinghouse was advising boresonic inspection of in service turbine rotors, Detroit Edison had contacted Westinghouse regarding on site inspection. Mr. Saez's letter relates that:

Westinghouse's response to this need [for on site inspection] was that they preferred to perform inspection in their Lester works. Therefore, (CMW) Commercial Machine Works were stipulated as the qualified source for this highly specialized program. CMW is the forerunner and developer of on site bore sonic and bottle bore equipment and are nationally recognized by EPRI [Electric Power Research Institute], Westinghouse, General Electric and others. Shop and future field equipment to be used by General Electric or Westinghouse is an adoption of the Commercial Machine Works equipment and technique.

While the Court does not make a judgment as to the factual content of Mr. Saez's letter, the Court does find that Mr. Saez's comments are evidence of the reaction of one in the utility industry to the patented invention. Based on this and other evidence, the Court finds that the patented device enjoyed commercial success and was perceived by Westinghouse and others as direct competition to Westinghouse's system of boresonic inspection.

5. *Finding of non-obviousness*

■ After careful consideration of the scope and content of prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and secondary considerations, the Court concludes the patented device was not obvious to a person having ordinary skill in the art of nondestructive ultrasonic inspection of rotors and similar objects.

C. *Compliance with 35 U.S.C. § 112*

Defendants contend the 006 patent does not meet the standards set by 35 U.S.C. § 112. 35 U.S.C. § 112 requires in part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Section 112 involves at least three separate, but closely intertwined, requirements: (1) the enabling requirement; (2) the description requirement; and (3) the definiteness requirement. *See Rengo Co. v. Molins Machine Co.,* 657 F.2d 535, 548–52 (3d Cir.1981). The enabling requirement provides that the patent application must "contain a written description of the invention, and of the manner and process of making and using it, ... as to enable any person skilled in the art to which it pertains ... to

make and use the same." 35 U.S.C. § 112. The description requirement states "the specification shall contain a written description of the invention." 35 U.S.C. § 112. The definiteness requirement states "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.

In their post trial brief, defendants contend "the patent in suit is invalid because it fails to describe any method or apparatus for accomplishing the result which was claimed to be achievable." They cite paragraph one of 35 U.S.C. § 112 to support this contention. At trial Professor Martin J. Adelman, defendants' expert in patent law, testified the 006 patent application failed to meet the requirements of section 112. He explained his position by stating:

> The initial claims as filed were supported in my view by the specification, indeed since the initial claims are an essential part of initial teaching, that would have to be so. But at any rate, they are supported by the specification. Starting with Amendment A elements were added, which are not supported by the specification. The elements that were added, as I outlined yesterday, were modified to some extent in Amendment B. I think you will recall that the word comparing was deleted, and the word combining was substituted. Then I believe that Amendment B, and you can correct me if my memory is inaccurate, is the first time there was a specific statement that the result of performing this step is an accurate characterization of size, shape and nature.
> Then in Amendment C we kept that, plus we added the correlation step, also not supported by the specification, as I testified. Therefore, the claims, of course, as you know, are invalid just for that reason under Section 112 as not being supported by the teachings of the specification.

Professor Adelman stated he was referring to the second paragraph of section 112, not the first paragraph. In Professor Adelman's opinion the patent specifications did not support the patent's claim to derive an accurate indication of the existence, position, nature, size, shape of flaws in the rotor material.

To avoid overlooking any argument advanced by defendants, the Court will examine the patent's compliance with all three requirements of section 112, although the Court has some doubt defendants articulated objections on all three grounds.

### 1. *Enabling requirement*

As defendants point out, the patent's description states: "If the propagated waves contact a flaw, there is a reflection to the pick-up means at the appropriate source 45 or 47, and an appropriate indication is sent back to a recording or display device 87." The schematic drawing of the preferred embodiment of the invention shows the recording or display device as simply a box labeled "87." The patent does clearly describe what type of information is being generated by the invention; this data was referred to at trial as "A-scan data."

 The enabling requirement is directed to one skilled in the art, 35 U.S.C. § 112, and "demands that the inventor describe the device in terms sufficient to enable one skilled in the art to make and use it." *Rengo Co. v. Molins Machine Co.*, 657 F.2d at 548. As the Third Circuit has stated:

> It is axiomatic that no description, however detailed, is "complete" in a rigorous sense. Every description will rely to some extent on the reader's knowledge of the terms, concepts, and depictions it embodies. Thus, an understanding of any description will involve some measure of inference. The Court of Customs and Patent Appeals recognized this principle in *In re Wiggins*, 488 F.2d 538, 543 (C.C.P.A.1973), when it said: "Every patent application and reference relies to some extent upon knowledge of persons skilled in the art to complement that disclosed in order that it be 'enabling' within the meaning of § 112." *See also In re Bode*, 550 F.2d

656 (C.C.P.A.1977) ("One skilled in the art would be expected to have sufficient basic knowledge to construct such means, the structure of which would be simple."). As *Bode* makes clear, skill in the art can be relied upon to supplement that which is disclosed as well as to interpret what is written.

*Rengo Co. v. Molins Machine Co.*, 657 F.2d at 549. As the Supreme Court stated in *Webster Loom Co. v. Higgins*, 15 Otto (105 U.S.) 580, 586, 26 L.Ed. 1177 (1882), an applicant "may begin at the point where his invention begins, and describe what he has made that is new, and what it replaces of the old. That which is common and well known is as if it were written out in the patent and delineated in the drawings." *See also In re Howarth*, 654 F.2d 103, 105–06 (C.C.P.A.1981).

Defendants contend the patent fails to describe how A-scan data from the ultrasonic transducers is combined to locate discontinuities in the rotor being tested.

To the extent that a person skilled in the art of ultrasonics is familiar with how "A-scan" data has been recorded by prior art and with the various devices available to gather such data, it is unnecessary to set out in the patent specification what types of devices one should use to gather such data. The specification in the 006 patent that provides for reflected ultrasonic waves to be sent back to a "recording or display device" is sufficient indication to allow one skilled in the art to know what steps are to be taken next, since one skilled in the art would already be aware of what types of equipment would be available which can be used to "combine" and "correlate" the data received. Trial testimony established that there are several different devices from which an operator may choose to display or record "A-scan" data, including strip chart records, cathode ray tubes, oscilloscopes, reel-to-reel magnetic tape recordings, video tape recordings and film. Both the patented ultrasonic inspection device and the Westinghouse device recorded data on strip chart recorders.

The Court finds one skilled in the art of ultrasonic testing could have determined how to make and use the patented invention from reading the patent specification.

## 2. Description requirement

"The description requirement is contained in the same sentence of [35 U.S.C. § 112] as is the enablement provision ... and both direct inquiry to the person with ordinary skill in the art." *Rengo Co. v. Molins Machine Co.*, 657 F.2d at 550 (footnote omitted). Defendants contend there is not a full, clear, concise and exact description in the specification of how one may obtain and correlate the A-scan data obtained from the transducers of the patented device. Nor, they contend, is there a full, clear, concise and exact description in the specification of hardware or apparatus for combining and correlating the A-scan data obtained from the transducers of the patented device.

The Court finds the specification does adequately describe the claimed invention. The Court of Appeals for the Federal Circuit has stated:

The test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter, rather than the presence or absence of literal support in the specification for the claim language. The content of the drawings may also be considered in determining compliance with the written description requirement.

*In re Kaslow*, 707 F.2d 1366, 1375 (Fed.Cir. 1983) (citations omitted). As stated above, the description requirement is measured against one having ordinary skill in the art of ultrasonic testing. Evidence established one skilled in the pertinent art would be aware of the various methods and various equipment that could be used to obtain and record the A-scan data generated by the invention's transducers.

### 3. Definiteness requirement

██ The definiteness requirement of section 112 applies to the patent's claims, not to specifications. *Rengo Co. v. Molins Machine Co.*, 657 F.2d at 551. "Definiteness means that 'the language of the claims must clearly set forth the area over which the applicant seeks exclusive rights.' The requirement essentially demands precision in the language of the claim, rather than adequacy of the disclosure or the description." *Id.* (quoting 2 D. Chisum, Patents § 7.04 at 7–51 (1981)). The purpose of the definiteness requirement is "to demarcate the boundaries of the purported invention, in order to provide notice to others of the limits 'beyond which experimentation and invention are undertaken at the risk of infringement.'" *Id.* (quoting *Norton Co. v. Bendix Corp.*, 449 F.2d 553, 555 (2d Cir.1971)).

██ Dr. Adelman testified the patent's claim "to derive an accurate indication of the existence, position, nature, size and shape of flaws in the rotor material" was not supported by the patent's specification. The patent specification states:

> In operation, the movable carriage is driven to provide both longitudinal and rotational sweeps, with the indexing apparatuses precisely locating the testing apparatus, and hence any flaws that are detected. If any flaws are present, the pulse-echo technique results in a reflected signal being detected by a pick-up device associated with the source on the plexiglass shoe to produce an output indicative of the presence of such a flaw. By utilizing this apparatus and the various modes of ultrasonic waves, the precise position of any flaw, the nature of the flaw and an accurate outline of the flaw can be achieved. In addition, the results are accurately reproducible, and hence the apparatus may be utilized at various times to determine if any flaws previously detected are showing signs of advancing or expanding.

Despite Dr. Adelman's testimony, the Court finds the claims are supported by this language in the specification.

### D. Accuracy of the patented device

The defendants assert the Commercial Machine Works ultrasonic inspection device was not able to achieve the results that the applicants of the 006 patent said that it could. Defendants rely in part on the testimony of Dr. Floyd Gelhaus who gave the results of a research project in which both the Westinghouse and Commercial Machine Works systems were evaluated by Battelle Columbus Laboratories in conjunction with the Electric Power Research Institute. Based on the research project, Electric Power Research Institute concluded there were problems with both the Commercial Machine Works and the Westinghouse systems, that their ability to accurately locate flaws in test rotors were inadequate, and that the "A-scan" data gave erroneous results. Dr. Gelhaus testified the Commercial Machine Works device was used to perform two inspections of a rotor and the data generated by the second inspection did not resemble that generated by the first inspection. Dr. Gelhaus admitted there were possible irregularities in the reinspection such as different electronic settings and the subjective performance of the Commercial Machine Works operator, which may have caused erroneous data to be generated. The study seemed to lack a set of standards for uniformly setting and calibrating equipment and also lacked control over the manner in which the devices were operated and the information gathered. Dr. Gelhaus also admitted he was not personally present at the ultrasonic inspections conducted on the Commercial Machine Works and Westinghouse systems. Based on these and other weaknesses in the study, the Court finds the Electronic Power Research Institute findings were not conclusive as to whether the Commercial Machine Works inspection device was able to arrive at an accurate indication of size, shape, nature, and position of flaws in the rotors tested.

Defendants also cite the failure of the patented device to give an accurate indication of the existence, position, nature,

158

shape and size of flaws in the rotor material during the inspection of rotors at Conners Creek No. 16 and Sunbury No. 3. According to defendants the Conners Creek No. 16 inspection illustrated the failure of the patented method and apparatus to provide an indication of the size and shape of a crack found in the rotor bore, and the Sunbury No. 3 inspection by Commercial Machine Works failed to identify the nature of the flaw.

Apparently the defendants are trying to discredit the patented device's accuracy by the presentation of the reports of the above inspections. Evidence produced at trial, however, indicates that not only did Westinghouse believe in the accuracy of the patented device, Westinghouse depended on such data generated by the patented device when Westinghouse hired Commercial Machine Works to do field inspections for defendants.

A rule of long standing still adhered to in this circuit is that "one who appropriates the teachings of a patent may not deny the utility of the invention." *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420, 428 (6th Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971). The Court has determined Westinghouse copied plaintiff's ultrasonic bore examination device. The evidence of Westinghouse's repeated failure to come up with an operative device for ultrasonic examination of rotor bores and the miraculous accomplishment of Westinghouse's devising such a system not long after plaintiff had introduced and successfully operated its own device supports the Court's determination. Thus, according to the established rule in this circuit, it would seem that defendants may not challenge the utility of the equipment which plaintiffs claim as its invention. *Tapco, supra.* Additionally, after weighing all the evidence, the Court finds defendants have not proved the patented device was not able to achieve the results claimed in the patent.

VII. *Conclusion*

To summarize, the Court finds plaintiff proved the 006 patent was infringed by Westinghouse's use of its boresonic inspection device to inspect TVA rotors. The Court finds the 006 patent valid and orders judgment entered for plaintiff on the issue of liability. The parties are directed to confer regarding the issue of damages and to notify the Court within forty (40) days of entry of this order if that issue can be resolved by the parties.